Good morning, your honors. May it please the court. My name is Nathan Ring, and I'm the counsel for the appellants in this matter, the IBW Pacific Coast Pension Fund trustees. The trustees request that this court overturn the order of the district court on summary judgment, as well as the order on damages that followed the order on summary judgment. The trustees request that this court overturn the district court, because the district court did not examine the supremacy of the Pension Protection Act of 2006. And instead, applied the International Reciprocal or Reciprocity Agreement, as it's been called in this litigation. Tell me the words of the statute that you think provide you with this support. Yes, absolutely, your honor. The statute is located at 1085, pardon me, 29 USC, 1085. And when you look at section E1B Romanet 1, it requires the trustees to adopt a rehabilitation plan. And as part of that plan, to include a default schedule. And that default schedule requires that the trustees reduce all benefit accruals and future benefits to the lowest level permitted by statute, which is contained in section 1085 E6. I had trouble seeing how that supports or controls your end of the case under the supremacy clause. I'm sorry, I phrased that badly. I had trouble seeing how the words of the statute compelled the result you urged. It looks to me as though it says, you may have to cut the pensions they receive. But I don't understand why it bears on whether, under a deal that the unions have relating to the travelers, that it controls how much is remitted by the trust that is inadequate to the traveler's home trusts. Section 1085 that I just cited regarding the default schedule has a second portion beyond reducing the future accruals and the future benefits. The second portion states that the trustees are to adopt a default schedule that contains benefit, pardon me, contribution increases that are necessary for the plan to emerge from critical status. Well, okay. Go ahead. I'm sorry, you can go first. Okay, so what specific provision required that to apply to these travelers? So maybe you have to lower how many benefits accrue and maybe you have to add fees, but is there anything that says you have to do that to essentially visitors from another plan? There's nothing in the Pension Protection Act that addresses reciprocal contributions at all. So then how can you say the statute requires it? Because Congress created the Pension Protection Act for the specific purpose of allowing these plans that are in critical status or are critically underfunded to recover from that critical underfunding. And they created this new stream of contributions. And that new stream of contributions is not part of the contributions that are required under the collective bargaining agreements in effect at the time the critical status designation is made for the plan. Well, okay. I don't think this is a really, this issue is really as difficult as it might appear on the surface. The act was amended to provide that these funds, your clients that were in difficulty, financial difficulty, they were required by the law to file this notice. And then they're given some additional powers to amend the plan, as you have indicated, and you're absolutely correct there, in order to get some additional contributions in from the plan's members, right? The problem is these aren't plan members. This money never belonged to your client in the first place. It is entirely fortuitous on any one day how many travelers happen to be in your plan's geographic area. And that was the whole reason for setting up this agreement between the various plans across the spectrum was because these people would find themselves, they might be here one week or month, and then they're someplace else, and they're not having any unified, so they have to have a home plan. Your client is basically just acting as a fiduciary for the pass-through, and they have an obligation to pass this money through and back to the plan in which the traveler is a member. Now, if that plan was in trouble, they would have the obligation or right to make that individual or individuals cough up additional contributions. But for our purposes, that's not the issue about their plan. It's your client's plan. So my problem is that these were not really your client's funds. Your client was just simply collecting these funds on behalf of someone else, just like someone else is collecting funds on behalf of your client. And when they come into your client, your client can make those additional deductions in accordance with your plan. So what you wanna do almost, let's assume that their plan is also in trouble. You deduct from them. The money then goes to their plan, and they deduct from them. So they get double deductions. That doesn't seem fair, nor does it seem like it's in accordance with the plan. It would appear to me at least, and maybe I'm taking too simplistic a view of this, that it doesn't apply. Why? Because these aren't your client's money. Judge Ezra, I would agree to a certain extent with your statement regarding the transfer of contributions and the money. So the 462 per hour in contributions that was set in the plan and by the CBAs at the time the critical status designation was made, that is contributions pursuant to a CBA under section 1.04 of the plan and 5.04 of the plan. The amounts that are required by the Pension Protection Act through the default schedule, which the trustees are required to adopt and put forward, those amounts are not monies that belong to the travelers because the purpose of the PPA is to protect this plan, the Pacific Coast plan, and to allow it to emerge from critical status. Do you remit those funds to the home travelers pension plan? Those amounts are not remitted to the travelers home plan because those amounts are given specific purpose by Congress of allowing this plan to emerge from critical status. No, no, no, no. I'm talking about before you went into critical status. Did those funds get remitted to the home plan? So there was an issue prior to- No, no, just the answer. Did, before critical status, before anything else was going on, did those funds go back to the home plan? I think the answer is yes. Are we discussing the 462 in contributions? Mike, we're talking about all the money that needed to be taken back pursuant to the agreement. The answer is yes with one caveat, and that caveat is the prior decision in this case when these trustees prior to a critical status designation took $1 directly from the 462 in contributions and kept it and only transferred 362 back. See, the problem is that you're using your trustee's actions to justify your trustee's actions, which might be good lawyering, but I don't know that it works. So I'd like this 462. Do the CBAs actually say 462? The CBAs at the time of the critical status designation were 462 in contributions, which pursuant to 1085- And they list out that specific amount in dollars and cents rather than saying something like the amount contributed or something like that. So each of the CBAs will have a schedule, and that schedule will have a schedule of different contributions and wages, and typically the amount will be spelled out. Now, there may be an MOU or an MOA afterwards that designates increases in contributions and wages, but there will be dollar amounts in the CBAs that will state what amounts are going to be contributed. Tell me something about the statute. When I look at E1B1, it refers to the bargaining parties. The statute is long and complex, and I have not looked up the definition of the bargaining parties. What is the definition? So for purposes of this plan, the bargaining parties, because it's a multi-employer plan, are the labor union and employers. That's what I suspected, so that's the way it is. It looks as though the bargaining parties would not include, then, the trust that the travelers' contributions have to be sent to. I'm sorry, can you ask that question again? The trust that receives the contributions from the home trust, where the travelers are doing their work. People come to California for one or another disaster that California has, and they come from Pennsylvania or someplace. Let's hypothesize Pennsylvania. They want all their contributions to go to Pennsylvania so that they'll get the biggest pension when they retire. California has the financial problem, wants to keep the money. Now, if I'm understanding what the bargaining parties means in E1B1, it means the California employer or employer consortium and the California union or union consortium in California. Not Pennsylvania and not the party that created the reciprocal agreement. So it looks as though Pennsylvania and the reciprocal agreement would not be affected at all by the distress of the California union, and would not be affected at all by the special provisions in E1B1, What am I missing here? So those bargaining parties in Pennsylvania would not be affected by the statute because they're not required to adopt a rehabilitation plan, but it does. Right, and under the reciprocal agreement, every dollar that California gets just has to be forwarded under the reciprocal agreement to Pennsylvania. Well, the reciprocal agreement states that all- Because Pennsylvania can't lose money on account of something it's not involved in. The reciprocal agreement states that all contributions pursuant to a CBA must be transferred with the Pension Protection Act contributions under the default schedule. Those are not required by the CBA. Those were required by the rehabilitation plan and its default schedule. Well, what makes the employer pay them? Well, these employers then adopted that plan, but had they not adopted it, there are two enforcement mechanisms that are written in the PPA to ensure that these rehab plans go into effect. First, you have 29 U.S.C. 1085 E3C, which states that if the parties do not adopt a new CBA with the rehabilitation plan terms, the trustees will be required upon expiration. But we just, so, okay. So you're saying the California employers or wherever these people are working, they have to agree to the PPA fees, but what requires them to not call them contributions? Such that they would be triggered by the reciprocal agreement. Because they're required to adopt the default schedule and that default schedule requires them to reduce all future benefits and benefit accruals and then only add in the increase in contributions that's necessary to emerge from critical status. It seems like if they're not gonna send every dollar under the reciprocal agreement, for whatever reason, they have to withdraw from the reciprocal agreement, which they can do. But if they withdraw from the reciprocal agreement, the withdrawal will affect the money in both directions. And these trustees did withdraw from the reciprocal agreement in 2016, but it's not the trustees' argument and they don't believe that the law is that they needed to withdraw from that agreement. They wanna be able to keep the money instead of forwarding it as the reciprocal agreement provides without withdrawing from the reciprocal agreement, even though they could withdraw from the reciprocal agreement and then they could keep the money. They would just have a real hard time attracting travelers. Because these trustees argue that these Pension Protection Act contributions are created by federal law and this federal law, which is later enacted about 20 years after actually this plan adopted the reciprocal agreement, that this later federal law controls because it created a sea change in what multi-employer plans have to do to fund themselves. But if you're going to, following up on Judge Kleinfeld's question, if this change to the plan is going to change what has to be paid under the reciprocal agreement, why didn't it need a majority vote of the signatories of the reciprocal agreement to approve that change? Because the federal law will preempt what's in the private contract. But you already told us that the federal law doesn't speak to travelers. It doesn't speak to travelers, but it does speak to the increased contributions under the default schedule and they can only be used for a single purpose, which is increasing the funding of this plan. We're right back where we were before trying to define what, whether it's benefit or non-benefit monies and who owns the money. And I would agree with you if there was no reciprocal agreement, but there was. And so these monies, to me, it looks like were contemplated under the reciprocal agreement to be just pass-through monies. And what you're saying is that somehow this amendment to allow these rehabilitation measures to be taken voided in one respect only, and we're getting right back to what Judge Kleinfeld said, one respect only voided the reciprocal agreement. And then I'm still having a difficult time trying to figure out how, and again, as Judge Kleinfeld and Judge Freeland also pointed out, you can do both. In other words, have your cake and eat it too. Get the money from the reciprocal agreement from your other travelers and yet not have to give them back because you decided that's the way it is. Your trustees decided that's the way it is. Certainly with these trustees, they decided that they're going to keep the Pension Protection Act amounts. There's no information in the record concerning what these other funds have as far as default schedules, if they are even critical status, what money's being sent back between the plans under the PPA. I don't know that that's critical. I think what's critical is what's happening with your client, clients. And one other concern with the Pennsylvania example and going back on the reciprocity agreement and the transfer is those funds in Pennsylvania and those travelers will be receiving a bit of a windfall because they're going to be working in a plan that is in critical status, which requires- But you could have written them out of it. You could have written it to say, we're going to increase the fees on everyone, but travelers, that's your fault about how you wrote the plan, how you wrote the amendment. Well, the increase in contributions is required for all hours of work in the jurisdiction. So the trustees are in charge of the hours of work in the jurisdiction, right? They have this jurisdictional area and they're increasing contributions under 1085. So you're saying the statute would not have permitted them to write this amendment to carve out people who are really contributing to a different plan? Yes, absolutely. What provision in this law though? You said it doesn't speak to travelers. So, and it doesn't speak directly to travelers, but what it does do is it specifically states that the trustees can only use these increased contributions, which are permitted pursuant to the statute for the specific purpose. Okay, fine. But who says you have to increase the contributions on travelers? So it's, that's not written into the plan, but for the CBA purposes, the parties adopted that default schedule and that default schedule would make bidding, when it comes to these plans, they have to bid. That's really interesting. I can see, I can see where they might because the California employers would want all travelers because it'll be cheaper. They won't have to contribute as much to pension funds, but that doesn't really bear on who gets to keep the money. And it sounds from your answer to Judge Friedland as though if it weren't for the business interest in avoiding that consequence, that the California plan could write out the travelers and say, you get your travelers cheaper. That could certainly be a reverse consequence. If you're going to try to attract travelers that way, the problem is your plan that you are already a trustee of, that you have a fiduciary duty to those participants. If you're not increasing contributions like you're required to do. Well, you can increase them on your own plan members. You just can't increase them on other people. Yeah, but you also have the other issue of treating all the members the same. People in the same classification have to have the same amount of contributions. So that's another issue where if you're saying this person's going to be a $4 contribution rate, this person's going to be a 13 contribution rate, then employers are going to want to bring in workers from other areas. They bring in the workers from the other areas. That means the people here in this plan at Tacoma, this Tacoma plan are going to lose membership. And in the previous appeal of this case, there was already evidence that what was happening was you were having people from the Tacoma local change their card, which means their membership from Tacoma or Kent up to Seattle for the purpose of getting increased contributions because of the Pension Protection Act amounts that are here. And that issue also goes against a further provision in the PPA that states that these PPA amounts can't be for increased contributions. Well, but isn't that a matter for Congress to address in terms of legislation if that situation is occurring? Or as you have pointed out, if your client feels that this is creating an unfair and puts them at some disadvantage, then they simply withdraw, which they did later. Which they did, but now the issue also comes in that the members in their plan are not having their amounts reciprocated. And the entire purpose of the reciprocal agreement was to ensure that people are earning their pensions. You're not getting a minor pension in Tacoma and your major pension in Seattle and a couple hours in Portland. What happens is they have the contributions transferred. Those contributions are transferred into the plan and credit is given for those amounts. So the pension amount, which is the same pension amount that would be contributed on behalf of the members in this plan, which is 462 per hour, which they're getting their accruals on, that same amount is being sent back to the home plans. Those home plans- Even now without the reciprocal agreement? Correct. They're getting the same, well, even now it depends because what would happen is there are these other private reciprocal agreements that happen between plans. And I can't speak to all of those. But what was happening under this amendment is the 462 in contributions that is being granted accrual for the people in this plan is also being sent back to people's home plans. That way they can accrue their pensions. So the overriding purpose of the reciprocal agreement is also being done because they're getting their amounts transferred that would be subject in this plan to benefits and benefit accruals. So the entire purpose of the reciprocal agreement is upheld while at the same time, if you keep the Pension Protection Act amounts here, the overriding purpose of Congress and ensuring that this plan emerges from critical status is also done service to. Okay, we've taken you over your time. I'll still give you a minute for rebuttal. And I apologize that we somehow put Tacoma in California. We can put it back in Washington. Sorry about that. And I'm from Nevada, we can be anywhere. Thank you. But if I'm not in Alaska, everything's California. Well, you're not in Alaska. You're in Fairbanks. Good morning, Your Honors. My name's Rich Birmingham. I'm with Davis Wright Tremaine, and I represent the class of travelers. It seems to me that you understand my theory of the case pretty well. And so let me just kind of dwell on that for a minute. Because as Your Honor pointed out, this involves pensions that seem complex. But really, it's kind of simple. It's a matter of contract law. And the basic flaw in the trust analysis that Your Honor pointed out is that when they sign up a reciprocity agreement, they've relinquished all power and control over those assets. In essence, they basically signed an agreement that said, we'll pay travelers prevailing wages in California. And whatever amount of that is supposed to be contributed to the Pacific Coast plan, it will be transferred to the home funds without deductions of any kind whatsoever. And the reason why this case is up here is that they didn't transfer the contributions without deductions. They took money for their own plan out of that, approximately $2.6 million. Now, they could change that. You know, they gave up that right when they signed the reciprocity agreement. There are two legal methods to change that. One is that they could amend the definition of contribution to withhold a portion of it so that now the definition says, no, we will transfer X amount, but we'll keep Y amount for ourselves. They could do that. The problem is that the reciprocity agreement says that you can't change that provision without a majority vote of all the signatories. They couldn't get the majority of signatories to do so. Did they try? I don't know whether they tried or not. All I know is that they've never amended the plan. I do know that there was a constitutional convention sometimes later, and this issue was brought up and was voted not to proceed. So I know it was discussed. I don't know whether any formal amendment was actually made. The second thing is that if they want these contributions to be their contributions and be subject to the reciprocal plan, it's not like they can't do so. It's not like all they have to do is terminate the reciprocity agreement. At that time, the contributions, instead of going to the home funds, are made directly to their plans. It's pursuant to their schedules and can be used for PPA. But the difference is, for the first time, is that the travelers would then be in their plan. They'd be a participant in the plan. They also accrue some kind of benefit under that plan for which they're funded. Right now, they don't treat the travelers as participants in any manner in their plan. They don't pay PBGC premiums. They don't give them any benefits. They're not in their plan at all. They're in the home funds. Your argument, counsel, is basically they're taking this dollar, which it appears to be a dollar, right? Right now, it's closer to $10. Oh, $10. It was a dollar at the time. It was a dollar. For purposes of our case, it's a dollar, right? No, for purposes of our case, it was $9 and some other dollars. Well, anyway, they're taking this money, all right? It started at a dollar. It started as a dollar. And every year, it escalates. OK, it started as a dollar. So they're taking this money from these travelers. It isn't an administrative fee that's written into the agreement. I mean, they could have written in an administrative fee. We're going to charge the individuals a certain amount of money to help administer this pass-through. But there isn't any such provision, is there? No, there isn't. All right, so then, wait, wait, wait. So you're like the anxious horse out of the gate here, biting at the gate. So they're taking this money out of there. But then, these travelers, whose money is being deducted from, are not getting any benefit whatsoever from this plan at any point. But they are contributing, somehow, to the health of the plan for which they are not a participant. Is that right? That is exactly right, Your Honor. They get nothing from it. They've never been a participant. The trust never treats them as a participant. And the reciprocity agreements are designed that way so that the assets are never considered an asset of the Pacific Coast plan at any point in time. Because, as you know, pension law is complex. And basically, what pension law says, once it becomes an asset of the Pacific Coast plan, even for a nanosecond, then, and that money is transferred someplace else, then all the benefit rights and features of the Pacific Coast plan have to attach to that contribution. So basically, these things are designed that they're never assets of the Pacific Coast plan for even a nanosecond. They're always deemed to be assets of the home plan. And you're right that they're taking money from the home fund and using it to fund their own plan. There's nothing in the Pension Protection Act that says healthy plans have to donate money to reciprocal plans. They're simply not their assets. What troubles me is you could have a major construction project. I mean, we're talking about a multi-year construction project where an individual steps out of their own plan territory and into another plan that's covered by this reciprocal agreement, and they're building a dam or something, and it's taking four or five years. They could have these contributions, which are, you know, they escalate every year, taken out. Their reduced amount is then going to their home plan, which then reduces their benefit because they're not contributing as much, right, to their home plan. Correct. Right? OK. But they're not getting any benefit. Even though they might have worked here for five years, they're not getting any benefits from the traveler plan, right? Correct, Your Honor. That is correct. Could Congress have really intended that? I don't think so. They could not. I mean, the whole purpose of the pension law is that you get benefits from the plan that you fund. You know? So it seems that your opponent was arguing, though, that the Tacoma employers who are employing these travelers are signatories to the CBAs for the workers in Tacoma, who mostly are members of this specific plan, and that the CBAs were updated to do this relabeling so that their contributions and then there are these non-contributions, and that under the new CBAs, they don't owe the non-contributions to the home plans. So how do we deal with that argument? So we deal with that in the sense that these are contributions under the terms of both plan document and the reciprocity agreement. So the plan document says that any payment made pursuant to a collective bargaining agreement is a contribution. The reciprocal document says that any payment made pursuant to a collective bargaining agreement. But if the collective bargaining, so any payment made, not any contribution made, is that the difference? Well, it defines contribution as any payment made to the plan pursuant. But then apparently, I think he's arguing that the CBAs were updated to have new schedules that have contributions and non-contributions. Well, the CBAs, what the CBA does is incorporate a schedule under the rehabilitation plan. So the parties will, so when this started, the rates were $4.62 an hour. And then they went up. Now they're $9. And there's different schedules. And one schedule will say it's $8. And one schedule will say it's $9. So in the CBA, they agree to make a contribution. And the rehabilitation plan, when you look at the schedules in there, it says employer contributions. And that says a percentage of the rate on 2009. So it says 128% in 2010. And so they're all employer contributions. The trust itself then distinguishes how they're going to use those contributions. But so you're saying that, because I don't think we have any of the CBAs in our record, am I right? You're right. So we have to kind of take both sides word for it. And it seems like maybe you have a different description of what the CBAs have said. I understand your opposing counsel to be saying the CBA itself now has a schedule in it that has non-contribution amounts under the PPA. Maybe that's not, I don't know whether you say that's not true. Well, it's not true. But it doesn't really matter. I mean, what the, first of all, for our purposes, the parties have stipulated that all these contributions were made pursuant to a collective bargaining agreement. But all these contributions meaning including these increases, what they call non-contributions. If I get this right, clear up my misunderstanding, if it is a misunderstanding. If I'm understanding your discussion correctly with Judge Ezra and Judge Friedland, if the Pacific plan were to prevail, then the SIC plan, the Pacific plan, would get additional money from the labor of the travelers. But the travelers would not get any additional, would not get any pension money that the additional contributions from the employers are creating. That's correct. I mean, when the PPA came back in. They would get to get the good part, but not the bad part. They get to get and keep the money, but not pay it out in pensions. Right. Instead, the travelers' work generates increased pensions for the Pacific employees, but not for the travelers who did the work. If I got that right? They at least would technically increase the funding for those individuals. I mean, the PPA itself says when the Pacific Coast plan, you know, they can do all these dramatic changes, but they're supposed to accrue some kind of benefit for the workers, at least 1%. What the trust is saying is, gee, they don't get anything at all. They don't get any accrual. They just get to fund everybody else's benefit. So I did understand that right. Thank you. So were there ever CBAs in this case's record, like in the district court or anywhere? No, Your Honor. Why? Because they stipulated that all the contributions were made pursuant to the CBAs, and this were the damages. So we never introduced it, because it was never an issue. And it's your position that it's their burden, because they're making an argument based on this incorporation? And this argument was really, the same issue was decided in Lehman One, and that was, what is an employer contribution? And the court there said, look, the plan document says it's any payment. The reciprocity agreement says it's any payment. It doesn't differentiate between benefit and non-benefit. They argue, they say, well, we didn't use the word non-benefit. If you look at the opinion at page 1217, it says the dollar or its holding was not a contribution, because it was not utilized for benefits. It was only utilized for funding. The difference is, if they want to make that distinction, if they want to amend their agreement to differentiate between contributions, they can do it. They just have to amend the definition of plan, but that takes a majority vote of all the signatories. So in order to call it something else, it takes an amendment. Or they can keep all the money. They just have to terminate the reciprocity agreement, which they finally did. And now there's no question. It's their assets. Congress says it's to be used for the benefit of those individuals. It's fine. So do they have to create, let me ask you this, do they have to create a, if they keep the funds and they don't pass them back to the pension plan, for which so they will have an individual account there? My understanding from opposing counsel is they don't. But do they have an individual account so that they can draw a pension? Let's say they had a long-term deal, and they accrue a lot of contributions. May not be as much as from their home plan, but do they get to then draw a reduced pension from the place where they were the traveler? And the answer is yes. Oh, they do. So they end up with a Pacific plan and a home plan. Yeah, they would end up with both. I mean, basically, you have to understand that these are pension plans, so there isn't an individual account. So it's a pension. But it depends on the definition of an employee. And so if they are covered by a collective bargaining agreement, the typical definition is if you're covered under a collective bargaining agreement to which contributions are made under this plan, then you start accruing a benefit. So you would start accruing a benefit under that. Well, this seems to run afoul of the whole purpose of what was originally envisioned, which was to prevent these travelers from having to figure out where they worked for all the years that they worked, and then make applications for pensions for six months here, eight months there, two years here. And in the old days, everyone had their own investing schedule. And the sum of the parts is never equal to the whole. So the idea is to get them all into a reciprocal plan, let them go elsewhere. And whatever the going rate in those plans are going to be transferred, whether it's higher or lower or whatever, or for whatever reason it was set. Thank you. We've taken you over your time. We'll give you a minute for rebuttal. Thank you, Your Honors. Three quick points on rebuttal. First, I want to clear up one thing from my argument that was brought out with opposing counsel. The collective bargaining agreements adopted the default schedule. I do not know, standing here today, whether or not that default schedule was just cut and pasted into the agreement. But the CBA, the bargaining parties, were required to adopt either the default schedule, or one of the alternative schedules, or the PPA, and force that on them. It would have automatically said, if you don't adopt one of these schedules, you're forced to adopt the default schedule. And that's what the plan sponsors, the trustees, would have adopted. So I don't know if it's specifically in the CBA, that cut and pasted table. Getting to the two actual points here. One, at the very least, we're looking at an issue of, are the contributions, the non-benefit contributions, as we call them, that were created by the Pension Protection Act, are they contributions under the reciprocal agreement? That's the major issue here. That's kind of the rub between the arguments. I hear your problem is with the word, any. Well, any payment made pursuant to a collective bargaining agreement, correct. And our argument on that point is that these aren't made because of the collective bargaining agreement. The collective bargaining agreement adopted them because the default schedule had them, and they were required to do so, or have it enforced on them. Well, I think the issue is also, do these funds belong in any way, shape, or form? Or do you have any authority in any way, shape, or form under the combination of the reciprocal agreement, which was then in effect, and the revised law, the amended law, to keep the funds unilaterally? I will say that opposing counsel has pointed to section 19A of the reciprocal agreement to state that it's just passed through. These funds are only, these trustees are only a conduit for funds. That's where the lower court found that they were passed through. Yeah, and the issue with that is section 19A of the reciprocal agreement states that amounts forwarded to the home plan are treated as being given directly to the home plan. These amounts pursuant to the PPA are not forwarded to the home plan. They're kept. Therefore, the trustees are not a pass-through entity for those amounts. They are a pass-through for the collective bargaining agreement amounts. When you say these amounts, you're talking about the dollar, which then escalated? The dollar that escalated. It's a percentage that escalated up. We're right back to where we were. Would we have the chicken or the egg going first? Because you're saying that that's the case, because your clients made it the case. Well, one thing that I think maybe might help dispel that is there was some briefing on the CNS Wholesale Grocers case from the Third Circuit. We cited it as well as the other side. And in that case, the Third Circuit was asked whether surcharges under the Pension Protection Act are amounts that are to be used in determining a contribution rate, a highest contribution rate for withdrawal liability. Now, that court said that the surcharge amounts under the PPA, which is 5% in the first year, 10% in any succeeding year, until the bargaining parties adopt an agreement that has a rehab plan in it, that those amounts are not going to be contribution, because they're not pursuant to a CBA. And the basis for that was on page 543 and 44 of that decision, where they pointed to section 1085E7, which stated that the surcharge amounts are to be collected on the same schedule as contributions and treated as delinquent contributions for that purpose. But nothing in this plan was surcharges. That's correct. And if the surcharges are not transferable, which is what the opposing side has said, if you look at section 1085E3C Romanet 4, there's a provision. I think you're way over your time, so I think I need to cut you off. Thank you, counsel. Thank you, both sides, for the helpful arguments. The case is submitted. I think we should take a five-minute break before our next two cases. So we'll be back in five minutes.
judges: Kleinfeld, Friedland, Ezra